21CA0809 Peo in Interest of JT 01-06-2022 COLORADO COURT OF APPEALS Court of Appeals No. 21CA0809 Douglas County District Court No. 20JV110 Honorable H. Clay Hurst, Judge The People of the State of Colorado, Appellee, In the Interest of J.T. and W.J.T., Children, and Concerning W.J.T., III, Appellant, and L.L.Z., Appellee. JUDGMENT AFFIRMED Division III Opinion by JUDGE LIPINSKY Furman and Brown, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 6, 2022 Lance J. Ingalls, County Attorney, Kathryn Cherry, Assistant County Attorney, Castle Rock, Colorado, for Appellee the People of the State of Colorado Gina G. Bischofs, Guardian Ad Litem Chelsea A. Carr, Office of Respondent Parents’ Counsel, Patrick R. Henson, Office of Respondent Parents’ Counsel, Denver, Colorado, for Appellant 
 Debra Dodd, Office of Respondent Parents’ Counsel, Berthoud, Colorado, for Appellee 
1 ¶ 1 In this dependency and neglect proceeding, W.J.T., III (father) appeals the juvenile court’s judgment allocating parental responsibilities for J.T. and W.J.T. (the children) to L.L.Z. (mother). We affirm. I. Background ¶ 2 In June 2020, the Douglas County Department of Human Services (Department) initiated an action in dependency and neglect and assumed temporary legal custody of the children. The Department alleged that mother had mental health issues that impacted her ability to care for the children. The Department further alleged that father lived in Utah, he had not had any recent contact with the children, and mother and father had a history of domestic violence. The parents made no-fault admissions to the petition, the juvenile court adjudicated the children dependent and neglected, and it adopted treatment plans for the parents. ¶ 3 In January 2021, mother moved for an order allocating parental responsibilities for the children and granting her sole decision-making responsibility for, and primary physical custody of, them. She also asked that father’s parenting time be professionally supervised. The Department agreed with mother’s proposed 
2 allocation of parental responsibilities (APR) arrangement, except that it recommended that father have unsupervised parenting time. ¶ 4 The juvenile court held an evidentiary hearing in April 2021. After hearing the evidence, the court took the matter under advisement before issuing a written order in May 2021. The court granted decision-making responsibilities and physical custody to mother; it awarded father supervised parenting time and provided a path for him to transition to unsupervised visits. The court certified the case into a domestic relations proceeding and closed the dependency and neglect matter. II. Judicial Notice of Criminal Charges ¶ 5 Father first contends that the juvenile court erred by taking judicial notice of his criminal convictions. Mother and the Department assert that, because the court never took judicial notice of the criminal convictions, father’s argument necessarily fails. We agree with mother and the Department. ¶ 6 During a discussion of preliminary matters, mother’s counsel asked the court to take judicial notice of father’s two criminal convictions. See CRE 201(a)-(b) (noting that a court may take judicial notice of an adjudicative fact not subject to reasonable 
3 dispute); People in Interest of T.T., 845 P.2d 539, 541 (Colo. App. 1992) (concluding that the juvenile court did not err by taking judicial notice of the parent’s criminal convictions). Father objected, asserting that the court could not take judicial notice of the convictions without “a certified criminal record.” Contrary to mother’s assertion, the court did not make a definitive ruling about whether it would take judicial notice of the convictions; instead the court stated that it would require mother’s counsel to “prove the evidence that may make [the convictions] relevant” and then it would “take up arguments on those cases and [a] further request” for judicial notice. ¶ 7 Later, mother’s counsel asked the caseworker whether father had “a criminal history related to domestic violence,” and father objected to relevance. The court overruled the objection, stating that it would “allow a little leeway” but would only consider the evidence if it was “relevant with regard to [father’s] relationship [with mother] and these children.” Mother’s counsel then rephrased the question to ask whether the Department had any information “relate[d] to domestic violence between [mother and father].” In response, the caseworker explained that the State of Utah denied 
4 the Department’s request to place the children with father in Utah because he did not pass the “background check.” However, the caseworker testified that she did not know “the specifics [of] the background check” or the reasons for its denial. In other words, the caseworker had no information about whether Utah denied the placement request because of father’s criminal history or some other reason. ¶ 8 But the caseworker did testify that she investigated father’s criminal history as part of her background investigation. The caseworker said that she “noted [father’s criminal history] in the Family Services Report,” which she said included “a trespassing case [and] a burglary case,” as well as “one past domestic violence case and a protection order violation.” The caseworker testified that she did not craft any treatment plan components based on father’s criminal history, however. ¶ 9 In sum, the record shows that mother asked the court to take judicial notice of father’s criminal convictions, but the juvenile court deferred ruling on the request at that time. Because mother never renewed her request for the court to take judicial notice of father’s convictions, nothing in the record from the APR hearing indicates to 
5 us that the court took judicial notice of father’s convictions. Nor do we see anything in the court’s order suggesting that it took judicial notice of those convictions. Therefore, we agree with mother and the Department that the court did not take judicial notice of father’s criminal convictions. ¶ 10 Finally, to the extent that mother produced evidence of those convictions through the caseworker’s testimony and report, father never objected to the admission of that evidence. See People in Interest of M.B., 2020 COA 13, ¶ 14 (In dependency and neglect cases, “generally appellate courts review only issues presented to and ruled on by the lower court.”). III. Supervised Parenting Time ¶ 11 Father next asserts that the juvenile court erred by entering an APR order that required him to exercise his parenting time in a supervised setting. We are not persuaded. ¶ 12 The Colorado Children’s Code authorizes a juvenile court to enter an order allocating parental responsibilities and addressing parenting time when it maintains jurisdiction in a case involving a child who is dependent and neglected. § 19-1-104(6), C.R.S. 2021; People in Interest of E.Q., 2020 COA 118, ¶ 10. Because the 
6 overriding purpose of the Children’s Code is to protect a child’s welfare and safety by providing procedures to serve the child’s best interests, the court must allocate parental responsibilities in accordance with the child’s best interests. L.A.G. v. People in Interest of A.A.G., 912 P.2d 1385, 1391-92 (Colo. 1996); L.G. v. People, 890 P.2d 647, 654 (Colo. 1995); People in Interest of H.K.W., 2017 COA 70, ¶ 13. ¶ 13 The allocation of parenting time and decision-making responsibilities are within the court’s discretion and will not be disturbed on review if the judgment is supported by competent evidence in the record. See People in Interest of A.M.K., 68 P.3d 563, 565 (Colo. App. 2003); see also People in Interest of D.G., 140 P.3d 299, 302 (Colo. App. 2006) (providing that visitation decisions are entrusted to the juvenile court’s sound discretion). It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence, and to assess the credibility of witnesses. People in Interest of A.J.L., 243 P.3d 244, 249-50 (Colo. 2010); see also In re Parental Responsibilities Concerning B.R.D., 2012 COA 63, ¶ 15 (when there is record 
7 support for the court’s findings, its resolution of conflicting evidence is binding on review). ¶ 14 In its APR order, the court awarded father in-person, supervised visitation to occur every other month beginning in June 2021 and continuing for six months. The court furthered ordered that, following the initial six-month period, father could begin unsupervised visits in January 2022. As relevant here, the court provided that supervised visitation was in the children’s best interests based on father’s “minimal contact” with the children and “the length in time that the children lacked contact with” him. Because the record supports the court’s findings, we decline to disturb them. ¶ 15 Here, the record shows that, prior to the case, father had not had any contact with the children since at least April 2019. As a result of father’s lack of a relationship with the children, the Department recommended that he have supervised visitation. However, the record shows that supervised visitation did not begin until March 2021, and father participated in only four supervised visits by the time of the APR hearing three months later. The caseworker testified that the Department would have offered in-
8 person visitation earlier in the case, but it could not arrange those visits because father did not make himself available sooner. The caseworker also expressed concern about father’s consistency in visitation once it did begin, noting that father arrived nearly an hour late for one visit and about twenty minutes late for another one. ¶ 16 To be sure, the caseworker testified that the Department was no longer recommending supervised visitation for father. But the caseworker also opined that, considering the young ages of the children and the fact that they had been in mother’s care for some time, “more consistent visits for a longer period of time would be beneficial for the [children] to really build [a] relationship with [father].” She also testified that, in general, supervised visitation should occur for a “consistent period of time” before transitioning to unsupervised visitation. ¶ 17 Based on this record, we cannot say that the court abused its discretion by requiring father to continue engaging in supervised visitation before transitioning to unsupervised visitation. ¶ 18 Nevertheless, father contends that the evidence before the court did not support an order limiting his parenting time to 
9 supervised visits. Specifically, he directs us to evidence that the caseworker no longer recommended supervised visitation and that the visitation supervisors said that they did not observe any safety concerns related to father’s parenting. Because it is within the court’s purview to weigh the evidence and assess the credibility of witnesses, we discern no error from the court’s decision to disregard some of the caseworker’s opinion or otherwise afford little weight to the visitation supervisors’ testimony. See A.J.L., 243 P.3d at 249-
50. Nor can we reweigh the evidence or substitute our judgment for that of the juvenile court even if there might be evidence supporting a different result. Id. at 256; see also B.R.D., ¶ 15. Rather, decisions about parenting time are within the court’s sound discretion, D.G., 140 P.3d at 302, and we cannot disturb the court’s decision where, as here, there is some evidence in the record supporting the court’s finding, see A.M.K., 68 P.3d at 565. ¶ 19 Father also appears to challenge the court’s decision that he exercise his parenting time in Colorado (rather than in Utah, where he lived). But father did not sufficiently develop this argument for us to decide the issue. Because the argument is undeveloped, we 
10 decline to address it. People v. Liggett, 2021 COA 51, ¶ 53, 492 P.3d 356, 366. IV. Conclusion ¶ 20 The judgment is affirmed. JUDGE FURMAN and JUDGE BROWN concur.